1  Joseph M. Alioto (SBN 42680)
2  Tatiana V. Wallace (SBN 233939)
   Angelina Alioto-Grace (SBN 206899)
3  ALIOTO LAW FIRM
   One Sansome Street, 35th Floor
4  San Francisco, CA  94104
   Telephone: (415) 434-8900
5  Email:  jmalioto@aliotolaw.com

6  [Additional Counsel Listed on Last Page]

7

8          **UNITED STATES DISTRICT COURT**

9          **NORTHERN DISTRICT OF CALIFORNIA**

10

11 Rosemary D'Augusta, Brenda Davis, Pamela      Case No:
   Faust, Carolyn Fjord, Donald C. Freeland,
12 Donald Frye, Gabriel Garavanian, Valarie      **COMPLAINT FOR VIOLATIONS OF**
   Jolly, Michael Malaney, Lenard Marazzo,       **SECTIONS 1 AND 2 OF THE SHERMAN**
13 Lisa McCarthy, Timothy Nieboer, Deborah       **ANTITRUST ACT (15 U.S.C. §§ 1 AND 2)**
   Pulfer, Bill Rubinsohn, Sondra Russell, June  **AND VIOLATION OF SECTION 7 OF THE**
14 Stansbury, Clyde Duane Stensrud, Gary         **CLAYTON ANTITRUST ACT (15 U.S.C. §**
   Talewsky, Pamela Ward, Christine M            **18)**
15 Whalen,  Mary Katherine Arcell,  Jose Brito,
16 Jan-Marie Brown, and Jocelyn Gardner,         **DEMAND FOR JURY TRIAL**

17          Plaintiffs,

18     vs.

19 American Petroleum Institute, Exxon Mobil
   Corporation, Chevron Texaco Capital
20 Corporation,  Phillips 66 Company,
   Occidental Petroleum Corporation, Devon
21 Energy, Energy Transfer LP,  Hilcorp
   Energy, and Continental Resources Inc., et al.
22
23          Defendants.

24

25     1.   The Plaintiffs allege that the Defendants combined and conspired between and

26 among themselves and with Saudi Arabia and Russia to raise the price of oil and gasoline.

27 They did what they combined and conspired to do.

28

                              1
          *Complaint for Violation of the Sherman Act*

1

**PROLOGUE**

2.   The United States is the largest producer of oil in the world.  Saudi Arabia is the second largest producer of oil in the world.  Russia is the third largest producer of oil in the world.

3.   Exxon Mobil is the largest oil company in the United States.  Chevron Texaco is the second largest oil company in the United States.  Phillips 66 is the third largest oil company in the United States.

4.   OPEC is the acronym for Organization of Petroleum-Exporting Countries.  OPEC was formed in 1961 to coordinate a common conduct for the production and sale of oil and fuel products.  Its members are Algeria, Angola, Indonesia, Iran, Iraq, Kuwait, Libya, Nigeria, Qatar, Saudi Arabia, the United Arab Emirates, and Venezuela.  Saudi Arabia is by far the largest member of OPEC.  OPEC is an international cartel. It operates throughout the world.  It exercises the power to control the production and price of oil and other fuel products for its members.  OPEC influences the price of oil and gasoline on a worldwide basis.

5.   OPEC+ is the acronym for all twelve OPEC members plus Russia.

6.   API is the acronym for the American Petroleum Institute, the trade association for the American oil producers, and provides a convenient forum for oil companies to meet and communicate between each other and among themselves.

7.   In November of 2016, OPEC and Russia agreed to limit the production and sale of oil and gasoline in an effort to increase prices. They maintained this agreement until March of 2020.

8.   On Thursday March 5, 2020, OPEC (principally Saudi Arabia) and Russia met in Vienna for the purpose of renewing the production limitation agreement of 2016, which

would run out on March 31, 2020.  At the meeting in Vienna, Russia complained that by reason of the OPEC+ production limitation agreement, American oil producers, principally the new shale oil producers, had been able to undercut Russia, capture some of Russia's market share, and establish the United States as the number one producer of oil in the world.

9.   On the next day, Friday, March 6, 2020, Russia refused to renew the production agreement with Saudi Arabia, and walked out of the meeting.

10. On the next day, Saturday, March 7, 2020, Saudi Arabia, in retaliation against Russia, announced plans to slash oil prices and increase production.

11. On Sunday, March 8, 2020, Saudi Arabia increased its production as the first step in an effort to produce more oil than it had ever done before.

12. On Monday, March 9, 2020, oil prices plunged 24% in the largest drop in more than three decades.

13. By reason of the actions of both Russia and Saudi Arabia to produce as much oil as they could, a world-wide price war broke out, and prices for oil and gasoline began to drop precipitously.

14. On Tuesday, March 10, 2020, the CEO of API, Mike Sommers, shocked by the price war, told Bloomberg that the major U.S. oil companies wanted to stabilize the oil prices by "balancing the oil market."  Mr. Sommers said, "What we have here is . . . a supply shock because of the decision by Russia and the Saudis to flood the market with oil." Sommers continued, "Ultimately the solution here is to work in a diplomatic way to make sure that oil markets are well balanced."  "The group's focus is on balancing the oil market." API and its members intended to do whatever was necessary to stabilize oil prices.

15. In furtherance of their objective to stabilize prices and stop the price war between Saudi Arabia and Russia, which was requiring members of API to compete with lower

prices, the CEO of API, at the specific instigation of the major oil company Defendants, contacted the White House to seek a meeting with the former President of the United States, Donald J. Trump.

16. Because of the price war between Russia and Saudi Arabia, the major U.S. oil company Defendants were forced to compete and lower their prices for oil and gasoline. However, in an attempt to prevent further erosion and decreases in the price of oil and gasoline, the major U.S. oil company Defendants agreed to take any surplus oil off the market, cut their production, and substantially reduce their investment in exploration and production.

17. Consequently, on March 24 and 25, 2020, in furtherance of their combination and conspiracy to cut production and raise the price of oil and gasoline, major oil companies announced that they would cut their production of oil. But these reductions were not enough.

18. Notwithstanding the efforts by the U.S. major oil company Defendants to stabilize and "balance the oil market," the continuing price war between Saudi Arabia and Russia, was substantially affecting prices in the United States. Russia and Saudi Arabia continued to produce large volumes of oil, and prices continued to fall.

19. On March 31, 2020, Saudi Arabia reported that it had achieved the largest production of oil in its history - more than 12.3 billion barrels per day. Saudi Arabia celebrated the event.

20. On the very next day, Wednesday, April 1, 2020, because of the price war and the increased production by Saudi Arabia and Russia, the former President Donald J. Trump, hailed the reduction of oil and gasoline prices, and the benefits of the free market system:

> "…and now, gasoline is going to be 99 cents a gallon and less. You know that. That's already starting. It's popping up. 99 cents. So that's like giving a

massive tax cut to the people of our country."

Former President Trump continued,

"The free market is a wonderful thing.  It's amazing how it can work."

21.  In addition, and on a roll, the former President, Donald J. Trump, wanted to take advantage of the low oil prices on behalf of the United States itself, stating that he could now buy oil at $20/barrel, or less, to fill the reserves of the United States.  He later instructed the Secretary of Energy, Dan Brouillette, to do so.  The Secretary agreed to do as the President said.  However, he was made aware of the objectives of the oil company Defendants and API and instead of purchasing the oil at low prices for the United States, he simply took the Defendants' excess oil off the market and stored it in the Strategic Petroleum Reserve (SPR) in order to eliminate available supply.

22. After contacts with some of the Defendant oil companies, and API, the former President agreed to meet with them to discuss the price war.  The attitude of former President Trump with regard to the very favorable results of the free market and the free enterprise system by reason of the Saudi and Russia price war, changed dramatically and turned toward seeking an agreement with Saudi Arabia and Russia to stop the price war between them so that prices could be raised for oil and gasoline.

23. On either the afternoon of Wednesday, April 1, 2020, or on Thursday, April 2, 2020, former President Trump, at the request of the Defendants, spoke with Vladimir Putin and with the Crown Prince of Saudi Arabia in an effort to stop the price war.

24. On the next day, Thursday April 2, 2020, after his conversations with Saudi Arabia and Russia, the former President tweeted:

"Just spoke to my friend MBS (Crown Prince) of Saudi Arabia, who spoke with President Putin of Russia, & I expect & hope that they will be cutting back approximately 10 Million Barrels, and maybe substantially more which, if it

happens, will be GREAT for the oil & gas industry! ...Could be as high as 15 Million Barrels. Good (GREAT) news for everyone!"

25. On the next day, Friday, April 3, 2020, the former President met with the CEOs of the Defendants and others in the Cabinet Conference Room in the White House.  The people who were present were as follows:

a)     The former President of the United States, Donald J. Trump;

b)     The American Petroleum Institute (API), by its Chief Executive Officer, Mike Sommers;

c)     Exxon Mobil Corporation, by its Chairman and Chief Executive Officer, Darren Woods;

d)     Chevron Corporation, by its Chairman and Chief Executive Officer, Michael Wirth;

e)     Phillips 66 Company, by its Chairman and Chief Executive Officer, Greg Garland, who was to later serve as the CEO of API;

f)     Occidental Petroleum, by its President and Chief Executive Officer, Vicki Hollub;

g)     Devon Energy Corporation, by its President and Chief Executive Officer, David Hager;

h)     Continental Resources, Inc., by its Chairman of the Board of Directors, Harold Hamm;

i)     Hilcorp Energy Founder and Chairman, Jeff Hildenbrand;

j)     Energy Transfer Partners, by its Executive Chairman, Kelcy Warren;

k)     The United States Secretary Department of Interior, by David Bernhardt;

l)     The United States Secretary Department of Energy, by Dan Brouillette; and

m)     The Office of the U.S. Trade Representative, by Trade Representative, Robert Lighthizer.

Others who were present at the introductory part of the meeting before the secret meeting were:

n)      Kevin McCarthy, United States Representative [R] California;

o)     John Cornyn, United States Senator [R] Texas;

p)     Ted Cruz, United States Senator [R] Texas; and

q)     Dan Sullivan, United States Senator [R] Alaska.

26. Before the secret part of the former President's meeting with the CEOs of the Defendants, and API, the President advised the CEOs that he would tell them about the specifics of his conversations with the Crown Prince of Saudi Arabia and President Vladimir Putin of Russia, in his effort to act as the facilitator to stop the price war so that the US producers could raise the price of oil and gasoline.

27. After the secret meeting with the Defendant oil companies, the CEO of API, Mr. Sommers, stated that the price war between Russia and Saudi Arabia, and the consequent excess supply of oil, were the principal subjects of the meeting.

28. As a result of the meeting, it was understood that if the price war were stopped, the Defendants would increase their prices for oil and gasoline.

29. On the following Monday and Tuesday, April 6 and 7, 2020, news articles appeared in the Wall Street Journal and the New York Times, stating that Saudi Arabia and Russia, as a condition of calling off the price war, required that the countries of North

America (the United States, Canada and Mexico), must also agree to cut production.

30. On Thursday, April 9, 2020, former President Trump signaled that there would be a reduction in domestic production when he tweeted: "[T]here is so much production, no-one knows what to do with it."

31. As a "signal" to Saudi Arabia and Russia, that the United States itself would cooperate in reducing the available oil supply on the market, Secretary of Energy, Mr. Brouillette, "opened the Strategic Petroleum Reserve (SPR) to store excess oil from the U.S. producers. And I am pleased to report that crude oil deliveries of 21.3 million barrels to the SPR have been completed, a positive signal for the crude oil markets."

32. Consequently, instead of filling the SPR with oil at very low prices for the benefit of the United States, the Department of Energy, in furtherance of the combination and conspiracy to withdraw oil supply from the market, simply stored over 20 million barrels of the excess oil from the U.S. producers and took it off the market.

33. On the same day, Thursday, April 9, 2020, OPEC held an emergency meeting to determine whether the price war would be called off.  As a result of that emergency meeting, OPEC+ (Saudi Arabia and Russia) agreed to call off the price war and further agreed to cut the production of oil by 10 million barrels per day for at least a two-month period.

34. API's Sommers lauded the agreement as the result of "strong U.S. diplomacy and reduced domestic production."  Mr. Sommers specifically stated that "this move will help stabilize world oil markets."  The American oil companies had agreed to the demands of Saudi Arabia and Russia.  The cartel now included the Americans.  It was, in effect and fact, OPEC++ (OPEC plus Russia plus America).

35. On Friday, April 10, 2020, at the G-20 meeting, it was made clear by Russian

President Vladimir Putin that everyone must reduce production of oil. He said that his

country made a deal with OPEC <u>and</u> the United States.  He said that a collective cut of 10

million barrels a day would be needed to balance the market:

> "We are all concerned about the way the situation is developing, everyone is interested in <u>joint</u> and—<u>I'd like to stress it</u>—<u>coordinated actions</u> to ensure long-term market stability."

36. At that same meeting, the former Secretary of Energy for the United States, Dan

Brouillette, made the following statement, admitting that he actively participated in reducing

oil supply by taking surplus oil off the market:

> "Speaking for my own country, the United States ….  We estimate by the end of this year, <u>U.S. production will see a reduction of nearly 2 million barrels per day</u>.  Some models show even more dramatic figures.  For example, <u>up to 3 million barrels per day.</u>
> * * *
> "For full recovery to recur, we must <u>stabilize world energy markets</u> by <u>putting an end</u> to this dangerous <u>price decline</u>."
> * * *
> "We call on all nations to use every means at their disposal <u>to help reduce surplus</u>."
> * * *
> "<u>For our part</u>, the United States is taking action to open our Strategic Petroleum Reserve <u>to store as much oil as possible</u>. <u>This will take surplus oil off the market</u> at a time when commercial storage is filling up and the market is oversupplied."
> * * *
> "And we will look for more opportunities to ease the hurt felt by our producers."
> * * *
> "<u>We want to restore price stability</u> . . ."

37. Thus, the American oil companies agreed to cut production by 2 million barrels per

day (or 3 million barrels per day) by the end of the year as a quid pro quo for the cessation

of the price war, just as Russia and Saudi Arabia had demanded.  In addition, the Secretary

of Energy aided and abetted the Defendants' conspiracy by storing and taking off the market

more than 20 million barrels of their oil in the Strategic Petroleum Reserve (SPR).

38. By Easter Sunday, April 12, 2020, the deal was done.  Competition in the oil industry was eliminated.  The former President and Secretary of Energy were facilitators.  There was no authority to extend any immunity whatsoever because there was no Congressional sanction for any of this conduct to fix prices, which would be required as a matter of law.  *See, United States v. Socony Vacuum Oil Co. Inc.,* 310 U.S. 150 (1940).

39. Prices for oil and gasoline now began their steady rise by the summer and would increase from 99 cents (or lower) to over $7 per gallon within two years.

40. From the beginning of the conspiracy and as an integral part of its success, the plan of the Defendant oil companies and API was to cajole and persuade former President Trump into abandoning any notion of the free enterprise principles, and, instead, to convince his "friends" Vladimir Putin of Russia and the Crown Prince of Saudi Arabia to end their price war, and to commit to a substantial reduction of their production so that the prices for oil and gasoline could increase to the substantial benefit of all producers, and to the substantial and catastrophic detriment of all consumers, and others who rely on oil and gasoline in their businesses, including, commuters, vacationers, and citizens just driving to the store.

41. These oil company Defendants are no strangers to agreements with their competitors to eliminate supply in order to increase prices.  They have abused their size on numerous occasions.  For example, in 1928 under the so-called "As-Is Agreement," which none of them signed, but which all of them adhered to, the object was to cut production and to take excess supply off the market in order to raise prices.  In 1935, they did the same thing again, and were criminally convicted for it.  *United States v. Socony Vacuum Oil Co. Inc.,* 310 U.S. 150 (1940).

42. The Defendants used the former President of the United States as a facilitator - see Congressional testimony of Daniel Brouillette - to obtain agreement from Saudi Arabia and

Russia to cut oil production, along with the American Defendants.  The acknowledged effect of these cuts was to increase the price of oil and gasoline.

43. Thus, the Defendant American Oil Companies agreed among themselves, and with Saudi Arabia and Russia, to cut the production of oil, to remove and store excess oil supply, to limit future exploration and production of oil, and to stop the price war that had erupted between Saudi Arabia and Russia, all for the purpose and with the intended effect to raise the price of oil and gasoline and other fuels in the United States and elsewhere.

44. By reason of these agreements, the price of oil and gasoline was substantially increased, just as the Defendants and co-conspirators had anticipated.  Moreover, because of the importance of fuel prices in the economy of the United States, a 50% contributor to inflation, the Defendants and co-conspirators reasonably foresaw that their agreement would ignite the fire of inflation throughout the country.  In the absence of these agreements, the price of oil and the price of gasoline would be substantially less than what they have become as a result of these agreements, and inflation would have been far less, if non-existent.

45. This is a private antitrust suit brought under Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15, 26) for actual and potential damages caused by, and for injunctive relief, including divestiture and disgorgement, made necessary by, the Defendants' past, present and threatened continuing violations of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 2), and the substantial elimination of competition by reason of the Defendants violation of the Section 7 of the Clayton Antitrust Act (15 U.S.C. §18).

46. Plaintiffs seek damages caused by reason of these violations and, in addition, seek injunctive relief, including divestiture and disgorgement, against this conduct as it continues

to substantially threaten injury and ongoing damage to the Plaintiffs and to many others who rely upon fuel in their businesses and in their daily lives.

47. Once the American Oil Defendants had met with former President Trump on April 3, 2020, they succeeded in convincing the former President to change his mind about the benefits to the American economy of low-priced oil, and convinced him, contrary to the interests of consumers, farmers, small businesses, and others, to support higher oil prices and to initiate inflation.  Former President Trump, in support of the American oil companies, and in order to prop up the price of oil, made direct calls to Mohammed bin Salman, the Crown Prince of Saudi Arabia, and Vladimir Putin, President of Russia, wherein the former President with the advice, consent, and prodding of the American oil companies promised that the American oil companies would reduce their production of oil to meet the oil production limitations pledged by Russia and Saudi Arabia, all with the purpose and intent of raising the price of oil and gasoline and other fuels "to restore price stability" in the United States and indeed worldwide.

48. The OPEC++ deal was initially stalled by Mexico, but repeated calls between former President Trump and Mexican President Andrés Manuel López Obrador, as well as Saudi Crown Prince Mohammed bin Salman and Russian President Vladimir Putin, succeeded in finalizing the agreement.  The former President of the United States, with the consent of the Defendant American Oil companies, promised to reduce production in the United States by some 250,000 to 300,000 barrels of oil a day in order to help Mexico reach the 400,000 barrel a day reduction demanded by Saudi Arabia and Russia.

49. By reason of these agreements, the price for a barrel of oil has substantially risen from less than $20.00 per barrel to over $100.00 per barrel.

50. By reason of these agreements, the price of a gallon of gasoline has risen from the

former President's acknowledged "99 cents per gallon and lower" to over $4.00 per gallon for regular and $5.00 for premium, and now approaching $6.00 or $7.00 per gallon, all as intended by the co-conspirators.  The fact that the price of a gallon of gasoline would continue to increase substantially was predicted by Harold Hamm, Chairman and CEO of Continental Resources, and by the former President, Donald J. Trump, in November of 2020.

51. As a consequence of these increases that have resulted from the Defendants' agreement to cut production and join the agreements with Saudi Arabia and Russia, any company that purchased oil or gasoline or fuel on the basis of dollars per barrel the damage since March and April of 2020 to today is at least $80.00 per barrel.

52. For any person who purchased gasoline on the basis of dollars per gallon, the damage since March and April of 2020 to today is at least $3.00 to $6.00 per gallon.

53. Because of the Defendants' price fixing, each of the Defendants announced the largest profits that they ever had in their history.  It was also revealed that they paid no taxes, and indeed some of them are entitled to rebates.

54. Under the principle that "a wrongdoer cannot profit by its own wrongdoing," the Defendants' profits flowing from the combination and conspiracy must be disgorged.

55. The Supreme Court on many occasions has stated that "size carries with it the opportunity for abuse which is not to be ignored when it is shown to have been utilized in the past."  The Defendants' abuse of their size in this case cannot be ignored.  Consequently, in order to ensure that the Defendants cannot profit by their own wrongdoing, orders of disgorgement must issue.

56. Also, in order to restore competition among oil companies in the United States, orders of divestiture must issue that separate Exxon from Mobil; Chevron from Texaco,

Phillips from Conoco; and any acquisitions or mergers by Occidental Petroleum, Devon Energy, Energy Transfer LP, Hilcorp Energy Company, and Continental Resources done either in 2018 and 2019. These unlawful acquisitions have contributed substantially to the ease with which these companies entered into the combination and conspiracy in 2020.

57.  Because of the violations alleged, the Defendant oil companies have complete control over the oil industry in the United States.  As one example of their power to fix prices and exclude competition is the following chart which demonstrates that the Defendants are now charging high prices for gasoline that do not even have any relationship to the descending price of crude oil.



58. Because of these artificial and conspiratorial increases, and because fuel prices make up as much as 50% of the rate of inflation from March of 2020 to the present, the

economy of the United States has been encumbered by a substantial increase in the price of other commodities and services dependent directly or indirectly upon the cost of fuel, including food, clothing, transportation, manufacturing, distribution and retail services.

59. By reason of the unlawful combination and conspiracies of the American oil company Defendants, the National and California average retail prices increased substantially over the last two years, as noted below.

**Retail Gas Price Averages - California & USA**

| Date | CA Retail Price | USA Retail Price |
|---|---|---|
| April 30, 2020 | $2.82 | $1.77 |
| May 31, 2020 | $2.77 | $1.96 |
| June 30, 2020 | $2.97 | $2.12 |
| July 31, 2020 | $3.10 | $2.17 |
| August 31, 2020 | $3.16 | $2.18 |
| September 30, 2020 | $3.17 | $2.16 |
| October 31, 2020 | $3.14 | $2.14 |
| November 30, 2020 | $3.12 | $2.12 |
| December 31, 2020 | $3.14 | $2.24 |
| January 31, 2021 | $3.26 | $2.39 |
| February 28, 2021 | $3.43 | $2.63 |
| March 31, 2021 | $3.78 | $2.86 |
| February 28, 2021 | $3.43 | $2.87 |
| March 31, 2021 | $3.78 | $2.85 |
| April 30, 2021 | $3.91 | $2.87 |
| May 31, 2021 | $4.06 | $3.02 |
| June 30, 2021 | $4.18 | $3.09 |
| July 31, 2021 | $4.25 | $3.13 |
| August 31, 2021 | $4.31 | $3.14 |
| September 30, 2021 | $4.31 | $3.17 |
| October 31, 2021 | $4.40 | $3.38 |
| November 30, 2021 | $4.59 | $3.39 |
| December 31, 2021 | $4.59 | $3.27 |
| January 31, 2022 | $4.58 | $3.32 |
| February 28, 2022 | $4.66 | $3.60 |
| March 21, 2022 | $5.85 | $4.25 |

*Complaint for Violation of the Sherman Act*





60. In the absence of these alleged agreements, the price of oil and gasoline would be substantially less than it was in April of 2020, and inflation would be substantially lower, if non-existent, at the present time.

### JURISDICTION

61. This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

62. Plaintiffs have paid more for gasoline to Defendants than they would have paid in a competitive market within the United States.

63. The Court has personal jurisdiction over the Defendants because all Defendants are domiciled and/or are found within the United States, and venue is proper in this District under 15 U.S.C. § 22, and under 28 U.S.C. § 1391. Defendants transact business and are found within this District.

64. Defendants have engaged in, and their activities have substantially affected the interstate and foreign trade and commerce of the United States. Defendants all provide a range of products and services that are intentionally marketed, distributed, sold, and offered to consumers throughout the fifty states and across state lines and in foreign countries.

65. The restraints alleged in this Complaint affect and are a burden on the free and open trade between and among the States of the United States and the trade and commerce between and among the United States and foreign nations.

## **THE PARTIES**

66. Each of the following Plaintiffs named below is an individual and a citizen of the State listed as the address for each such Plaintiff, and in the four years prior to the filing of this action, each Plaintiff was a consumer of gasoline:

      Rosemary D'Augusta, Burlingame, CA
      Brenda Davis, Dallas, TX
      Pamela Faust, Cincinnati, OH
      Carolyn Fjord, Sacramento, CA
      Donald C. Freeland, Cincinnati, OH
      Donald Frye, Colorado Springs, CO
      Gabriel Garavanian, Boston, MA
      Valarie Jolly, Dallas, TX
      Michael Malaney, Grand Rapids, MI
      Lenard Marazzo, Reno, NV
      Lisa McCarthy, Naples, FL
      Timothy Nieboer, Kalamazoo, MI
      Deborah Pulfer, Sidney, OH
      Bill Rubinsohn, Philadelphia, PA
      Sondra Russell, Waco, TX
      June Stansbury, Reno, NV

Clyde Duane Stensrud, Seattle, WA
Gary Talewsky, Boston, MA
Pamela Ward, Holmes Beach, FL
Christine M Whalen, New Orleans, LA
Mary Katherine Arcell, New Orleans, LA
Jose Brito, Reno, NV
Jan-Marie Brown, Reno, NV
Jocelyn Gardner, Colorado Springs, CO

67. Plaintiffs are consumers of gasoline, and each has purchased gasoline from Defendants' company-owned stores and/or other gas stations that have distributed gasoline produced by Defendants, and/or their co-conspirators, and they have been harmed and continue to be threatened with harm and damage in that they have been deprived of price competition that they otherwise would have enjoyed but for the Defendants' anticompetitive agreement to reduce the production of oil in order to raise the price of oil and gasoline.

68. Plaintiffs have both directly and indirectly paid Defendants and/or the co-conspirators for gasoline whose prices have been inflated by the Defendants' conspiracy.

69. Defendant American Petroleum Institute (API) is a non-profit trade association, and is a non-profit corporation organized and existing under the laws of the District of Columbia.  It is headquartered in Washington DC. It is comprised of members who are engaged in the production, distribution and sale of oil. API served as a forum and a facilitator whereby they have the opportunity and use that opportunity to conspire against the public and have contrived means to raise prices.  In this case, they did just that.

70. The Chairman of API from 2018 to 2020 was Darren Woods, the Chairman and Chief Executive Officer of Exxon Mobil.

71. The Chairman of API from 2020 to 2022 was Greg Garland, Chairman and Chief Executive Officer of Phillips 66.

72. The Chairman of API from January 2022 to present is Michael Wirth, Chairman

and Chief Executive Officer of Defendant Chevron. Each of these executives also served on the executive committee of API, and had the opportunity and used this opportunity to stabilize prices.

73. Defendant Exxon Mobil Corporation is a corporation organized and existing under the laws of the State of New Jersey.  It is the largest oil and gas production company in the world.   It is headquartered in Irving, Texas.  Exxon revenue for the twelve months ending December 31, 2021, was $285 billion, a 57% increase year-over-year.  Exxon gross profit for the twelve months ending December 31, 2021, was $55 billion, a 78% increase year-over-year.  Defendant Exxon Mobil is one of the successor companies of Standard Oil Company after the mandated break up in 1911 by the Supreme Court of the United States in *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1 (1911).

74. Defendant Chevron Texaco Capital Corporation is a corporation organized and existing under the laws of the State of California.  It is headquartered in San Ramon, California.  Chevron revenue for the twelve months ending December 31, 2021, was **$**162 billion**,** a 72% increase year-over-year.  Chevron gross profit for the twelve months ending December 31, 2021, was $95 billion, a 140% increase year-over-year.  Defendant Chevron is one of the successor companies of Standard Oil Company after the mandated break up in 1911 by the Supreme Court of the United States in *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1 (1911).

75. Defendant Phillips 66 Company is a corporation organized and existing under the laws of the State of Delaware.  It is headquartered in Houston, Texas.  Phillips 66 revenue for the twelve months ending December 31, 2021, was $111 billion**,** a 74% increase year-over-year.  Phillips 66 gross profit for the twelve months ending December 31, 2021, was $9.4 billion, a 46% increase year-over-year.  Defendant Phillips 66 Company was

formerly ConocoPhillips which was a spin-off of Standard Oil Company after the mandated break up in 1911 by the Supreme Court of the United States in *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1 (1911).

76. Defendant Occidental Petroleum Corporation is a corporation organized and existing under the laws of the State of Delaware. It is headquartered in Houston, Texas. Defendant Occidental Petroleum Corporation is an American company engaged in hydrocarbon exploration in the United States.  Occidental Petroleum revenue for the twelve months ending September 30, 2021, was $22.2 billion, almost a 10% increase year-over-year.  Occidental Petroleum gross profit for the twelve months ending September 30, 2021, was $13.1 billion, a 15% increase year-over-year.

77. Defendant Devon Energy is a corporation organized and existing under the laws of the State of Delaware.  It is headquartered in Oklahoma City, Oklahoma. Defendant Devon Energy is an independent energy company engaged primarily in the exploration, development and production of oil, natural gas and natural gas liquids.  Devon Energy revenue for the twelve months ending December 31, 2021, was $11 billion, a 147% increase year-over-year.  Devon Energy gross profit for the twelve months ending December 31, 2021, was $9.8 billion, a 163% increase year-over-year.

78. Defendant Continental Resources Inc. is a corporation organized and existing under the laws of the State of Oklahoma.  Defendant Continental Resources Inc. is an American petroleum and natural gas exploration and production company.  It is headquartered in Oklahoma City, Oklahoma. Continental Resources revenue for the twelve months ending December 31, 2021, was $5.7 billion, a 121% increase year-over-year.

79. Defendant Energy Transfer LP is a company engaged in natural gas and propane pipeline transport.  It is organized under the laws of the State of Delaware and

headquartered in Dallas, Texas.  Energy Transfer LP's revenue for the twelve months ending September 30, 2021, was $58.8 billion, a 38% increase year-over-year.  Energy Transfer LP's annual gross profit for 2020 was $13.5 billion.

80. Defendant Hilcorp Energy Company is a corporation organized and existing under the laws of the State of Texas. Defendant Hilcorp Energy Company is one of the largest, privately held oil and gas exploration and production companies in the United States.

81. Various persons, partnerships, firms, and corporations not named as Defendants in this lawsuit, and individuals, the identities of which and who are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the illegal contracts, combinations, and conspiracies.  When and if these persons are discovered, the Plaintiffs may seek to amend the Complaint to include them as co-conspirators.

## **VIOLATIONS ALLEGED**

### *First Claim for Relief*
### *An Agreement to Reduce Production of Oil in Violation of the Sherman Antitrust Act § 1*

82. Plaintiff incorporates the allegations of paragraphs 1 through 81  above.

83. The Defendants combined and conspired to fix and stabilize prices by agreeing to reduce production, store surplus oil, and engage in other acts designed for the purpose and with the effect of increasing and stabilizing prices of oil and gasoline, all in per se violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

### *Second Claim for Relief*
### *Conspiracy to Monopolize in Violation of the Sherman Antitrust Act § 2*

84. Plaintiff incorporates the allegations of paragraphs 1 through 83 above.

85. The Defendants have combined and conspired to suppress and eliminate actual and

potential competition in the production and sale of oil and gasoline by agreeing to reduce the production and to increase the price of oil and gasoline in the United States. The Defendants have combined and conspired to suppress and eliminate the actual competition between and among themselves and with Saudi Arabia and Russia in the production and sale of oil and gasoline.

86. By reason of their combination and conspiracy to cut production and raise the prices of oil and gasoline, the Defendants exercised their power to fix prices and exclude competition, and they did both as factually alleged above.

87. The Defendants' anticompetitive practices violate Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

*Third Claim for Relief*

*Anticompetitive Mergers and Acquisitions*

88. Plaintiff incorporates the allegations of paragraphs 1 through 87 above.

89. The top three major oil companies in the United States, Exxon Mobil, Chevron Texaco, and Phillips 66, are the result of the unlawful mergers or acquisitions. In each case, the mergers and acquisitions substantially lessened competition and tended to create a monopoly in the production, distribution and sale of oil and gasoline.

90. As noted above, these three Defendants acted in combination to reduce production and to increase prices of oil and gasoline. In doing so, they achieved the status as a group to be able to fix prices and exclude competition. They have abused their size. They have previously engaged in combinations and conspiracies to limit production and to increase prices. They have a contumacious disregard of the antitrust laws, and have demonstrated by the facts alleged above that they have no compunction about violating the law if and when it pleases them to do so, and that they have repeatedly done so as an abuse of the size and power they have achieved as a result of these unlawful mergers.

91. As a consequence of these mergers and acquisitions and the ease with which The Defendants cooperate with each other on matters that are clearly unlawful, it is necessary that they be required to split up into individual companies in an effort to restore competition in the oil industry.

### **REQUEST FOR RELIEF**

92. To remedy these illegal acts, Plaintiffs request that the Court find as follows:

a. Adjudge and decree that the alleged combination and conspiracy between and among the Defendants, and the combination and conspiracy between and among the Defendants, Saudi Arabia and Russia, are illegal combinations and conspiracies in violation of Section 1 of the Sherman Antitrust Act, in that they combined and conspired to cut production and raise prices;

b. Adjudge and decree that the alleged combination and conspiracy between and among the Defendants, and the combination and conspiracy between and among the Defendants, Saudi Arabia and Russia are illegal combinations and conspiracies in violation of Section 2 of the Sherman Antitrust Act, in that they achieved the unlawful power to exclude actual and potential competition and to fix prices and did so;

c. Enter judgment in favor of Plaintiffs and against the Defendants and award Plaintiffs threefold the amount of the damages as awarded by the jury and award Plaintiffs their reasonable attorneys' fees and costs, and any pre-judgment and post-judgment interest as permitted by law;

d. Enjoin the Defendants from entering into any combination or conspiracy to fix or stabilize prices, including any agreements or understanding to limit production, distribution or sale of oil or gasoline;

e.      Enjoin the Defendants from entering into any combination or conspiracy with either Saudi Arabia or Russia, or both, to fix or stabilize prices, including any agreements or understanding to limit production, distribution or sale of oil or gasoline;

f.      Require the Defendants to disgorge the profits earned from their violations of Sections 1 and 2 of the Sherman Antitrust Act, the amounts of which can be determined by the jury;

g.      Enter any other preliminary or permanent injunctive relief necessary and appropriate to restore competitive conditions in the markets affected by the Defendants' unlawful conduct; and

h.      Enter an order requiring that Exxon be divested of Mobil; Chevron be divested of Texaco; Phillips 66 be divested of Conoco; and that all of them be split up into individual companies as made necessary to restore competition in the oil industry;

i.      Enter any additional relief the Court finds just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as its right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

Dated:  March 28, 2022                      ALIOTO LAW FIRM

By:  /s/ *Joseph M. Alioto*
                          Joseph M. Alioto (SBN 42680)
                          Tatiana V. Wallace (SBN 233939)
                          Angelina Alioto-Grace (SBN 206899)
                          One Sansome Street, Suite 3500
                          San Francisco, CA  94104
                          Telephone: (415) 434-8900
                          Attorneys for Plaintiffs

ADDITIONAL PLAINTIFFS COUNSEL:

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

Robert J. Bonsignore (SBN
BONSIGNORE TRIAL LAWYERS, PLLC
23 Forest Street
Medford, MA 02155
Phone: 781-856-7650
Email: rbonsignore@classactions.us

Theresa Moore (SBN 99978)
LAW OFFICE OF THERESA D. MOORE PC
One Sansome Street, 35th Floor
San Francisco, CA 94104
Phone: (415) 613-1414
tmoore@aliotolaw.com

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com

Christopher A Nedeau (SBN 81297)
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

*Complaint for Violation of the Sherman Act*